**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

BRENT GANGER, as Trustee for the Next of Kin of RENEE NICOLE MACKLIN GOOD, Deceased, and REBECCA GOOD,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No. ___________________

**COMPLAINT**

1. On the morning of January 7, 2026, Renee Nicole Macklin Good ("Renee"), a thirty-seven-year-old United States citizen and mother of three, dropped her six-year-old son at school and drove home through her own south Minneapolis neighborhood, where federal immigration agents deployed as part of "Operation Metro Surge" were operating. Renee stopped her car on Portland Avenue and honked her horn to alert her neighbors. Her partner, Rebecca Good ("Becca"), got out and began to film the agents with her cell phone. Renee stayed behind the wheel.

2. Neither Renee nor Becca were the target of any investigation, they had not committed nor threatened any act of violence, and they were breaking no law that any federal officer had authority to enforce. Numerous vehicles, including the unmarked Chevrolet Tahoe driven by U.S. Immigration and Customs Enforcement ("ICE") agent Jonathan Ross ("Ross"), drove around their stopped car without incident.

3. Ross got out of his Tahoe with his cell phone in his hand, already recording. He circled Renee's car, filming. He walked past her open driver's side window, and she spoke to him: "That's fine dude. I'm not mad at you. I'm not mad at any of you." Two more ICE agents pulled up on the other side of her car. Renee waved them around and told them, "just go around." Instead, they got out of their truck, and one of them shouted, "Out of the car. Get out of the fucking car." One of the agents attempted to open her driver's side door.

4. Renee turned her wheels away from Ross and began to pull slowly forward. Ross moved out of the vehicle's path. Then he leaned forward toward the vehicle, drew his firearm, and fired a round through the bottom left quadrant of her windshield. As Renee's car continued its slow turn away from Ross, he fired twice more through her open driver's side window. One of the two rounds entered Renee's left temple. As her car careened down Portland Avenue and crashed into a parked car, Ross cursed, "fucking bitch." Becca, who had been standing a few feet from the vehicle when Ross fired into it, ran down the street to the wreck, where she found her partner bleeding from a gunshot wound to her head.

5. No agent rendered aid. When a bystander offered to help, an ICE agent told him, "No, back up, now!" When the man identified himself as a physician, the agent answered, "I don't care." Renee was pronounced dead at Hennepin County Medical Center at 10:30 a.m. The Hennepin County Medical Examiner recorded the manner of her death as homicide, the cause of her death as multiple gunshot wounds, and, as to how her injuries occurred, that the "[d]eceased was shot by a law enforcement officer."

6. Ross's conduct violated the Fourth Amendment and the mandatory use-of-force policies of his own Department — policies that permit deadly force only against an imminent threat of death or serious bodily injury, prohibit deadly force used solely to prevent escape, prohibit firing at the operator of a moving vehicle, direct agents not to place themselves in positions in which they have no alternative to deadly force, and require agents to obtain medical assistance for the injured as soon as practicable. Ross and the agents alongside him violated every one of these commands.[1]

7. Plaintiff Brent Ganger is Renee's brother and the duly appointed trustee for her next of kin: her three minor children, her parents, and her siblings. He brings this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, asserting a claim for wrongful death under Minn. Stat. § 573.02 predicated on the battery, assault, false imprisonment, intentional infliction of emotional distress, and negligence that caused Renee's death, and asserting each of those torts as independent claims. He seeks to recover for the immense suffering Renee endured in the final moments of her life and for the profound and permanent losses that her death has inflicted on her family.

8. Plaintiff Rebecca Good is Renee's partner. She was standing feet from the couple's vehicle when Ross fired three rounds into it, and she watched her partner be shot in the head. She brings this action against the United States under the FTCA, asserting

[1] U.S. Dep't of Homeland Sec., Policy Statement 044-05 (Revision 01), *Update to the Department Policy on the Use of Force* (Feb. 6, 2023), available at https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf.

claims for intentional infliction of emotional distress and negligent infliction of emotional distress. She seeks to recover for the severe emotional distress, and its attendant physical manifestations, that the agents' conduct has inflicted upon her.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1346(b)(1), which vests the federal district courts with exclusive jurisdiction over civil actions against the United States for money damages for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.

10. Under the FTCA, the United States is liable for such injury or death in the same manner and to the same extent as a private individual under like circumstances, in accordance with the law of the place where the acts and omissions occurred, here, the State of Minnesota. 28 U.S.C. §§ 1346(b)(1), 2674.

11. Plaintiff Ganger's claims of assault, battery, and false imprisonment are expressly authorized by the FTCA's law-enforcement proviso, 28 U.S.C. § 2680(h), because they arise from the acts and omissions of "investigative or law enforcement officers of the United States Government." Ross and the other officers and agents of ICE and the U.S. Department of Homeland Security ("DHS") whose conduct is described in this Complaint were federal officers empowered by law, including 8 U.S.C. § 1357, to execute searches, to seize evidence, and to make arrests for violations of federal law.

12. Plaintiffs have each satisfied the FTCA's presentment requirement, 28 U.S.C. § 2675(a). On March 11, 2026, Plaintiff Ganger presented an executed Standard

Form 95, together with a supporting attachment and exhibits, to ICE, DHS, and U.S. Customs and Border Protection ("CBP") by certified mail and e-mail.

13. On March 17, 2026, Plaintiff Rebecca Good presented an executed Standard Form 95, together with a supporting attachment and exhibits, to ICE, DHS, and CBP by certified mail and e-mail.

14. More than six months have elapsed since each claim was presented, and no agency has made a final disposition of either claim in writing. The claims are therefore deemed finally denied. 28 U.S.C. § 2675(a). Plaintiffs have exhausted their administrative remedies, and this action is timely under 28 U.S.C. § 2401(b).

15. Venue is proper in this District under 28 U.S.C. § 1402(b) because the acts and omissions complained of occurred in Minneapolis, Hennepin County, Minnesota, within this District.

16. Plaintiff Ganger's capacity to maintain this action is conferred by Minn. Stat. § 573.02 and by the Order for Appointment of Trustee entered on January 30, 2026, in the Minnesota District Court, Fourth Judicial District, Court File No. 27-CV-26-844.

## PARTIES

17. Plaintiff Brent Ganger is a natural person and the brother of Renee Nicole Macklin Good. On January 30, 2026, on his petition under Minn. Stat. § 573.02, subd. 3, and Minn. Gen. R. Prac. 144, the Honorable Karen Janisch of the Minnesota District Court, Fourth Judicial District, Hennepin County, appointed him trustee for the next of kin of Renee Nicole Macklin Good, to serve without bond. He brings this action in that capacity, for the exclusive benefit of the decedent's surviving next of kin.

18. Plaintiff Rebecca Good is a natural person and a resident of Minneapolis, Hennepin County, Minnesota. She was Renee's partner. She and Renee moved to Minneapolis together, lived together, and were together raising Renee's six-year-old son, E.M. She was present on Portland Avenue on the morning of January 7, 2026, standing feet from the couple's vehicle, when Ross fired three rounds into it and killed Renee. She brings this action in her individual capacity.

19. Renee Nicole Macklin Good, the decedent, was born on April 2, 1988, and was thirty-seven years old on the day she was killed. She was a United States citizen. She lived in south Minneapolis with her partner, Becca, and her six-year-old son. She was a member of the school board at her son's school, had recently applied to work there as a substitute teacher, and was preparing to pursue a master's degree in English.

20. Renee's next of kin are her three minor children, S.S. (age fifteen at the time of her death), R.S. (age twelve), and E.M. (age six); her mother, Donna Ganger; her father, Timothy Ganger; her brothers, Brent Ganger, Quinten Ganger, and Luke Ganger; and her sister, Anna Collins.

21. Defendant United States of America, acting through DHS and its components ICE and CBP, is the proper defendant for claims brought under the FTCA. 28 U.S.C. §§ 1346(b), 2679.

22. At all times relevant to this Complaint, Ross and the other ICE, CBP, and DHS officers and agents whose acts and omissions are described herein were employees of the United States acting within the scope of their offices and employment as federal law enforcement officers. Upon information and belief, Ross was a deportation officer of ICE.

## FACTUAL ALLEGATIONS

23. On the morning of January 7, 2026, Renee and Becca dropped Renee's six-year-old son at school. As they returned home, they encountered ICE agents who were part of Operation Metro Surge. Like many members of their community, Renee and Becca were concerned about ICE's conduct and the effect it was having on their friends and neighbors.

24. Renee was driving the couple's Honda Pilot, which also carried their dog, Wapsie. She stopped the vehicle on Portland Avenue between 33rd and 34th Streets in Minneapolis. Exercising her First Amendment rights, Becca exited the vehicle and began filming ICE activity, while Renee remained in the vehicle.

25. While the Honda Pilot was stopped in the street, it was not preventing cars from proceeding. Numerous vehicles, including the Chevrolet Tahoe driven by Ross, drove around the Honda Pilot while it was stopped.

26. Renee was not the target of any law enforcement investigation. She had no criminal history.

27. ICE agents are not empowered to enforce Minnesota traffic laws.

28. No agent at the scene possessed any evidence or information that Renee had engaged in any unlawful obstructive conduct.

29. After driving past the Honda Pilot, Ross got out of his car, already filming with his cell phone, which was initially in his right hand before he moved it to his left hand. Ross immediately walked directly in front of the Honda Pilot, and proceeded to the driver's side window.

30. As Ross walked by the open driver's side window, Renee said to him: "That's fine dude. I'm not mad at you. I'm not mad at any of you." Ross continued circling the car, had an interaction with Becca, and then proceeded back toward his own vehicle.

31. As Ross was returning to his vehicle, two ICE agents stopped their pickup truck on the other side of the Honda Pilot. Renee motioned for the ICE agents to go around her and said, "just go around." Instead of proceeding around the car — as numerous vehicles had already done — the ICE agents got out of their vehicle, with one instructing: "Out of the car. Get out of the fucking car."

32. On information and belief, another ICE agent gave Renee an instruction to leave the scene.

33. One of the agents attempted to open the front driver's-side door of the Honda Pilot as Renee began to slowly reverse the vehicle. At this point, Becca was standing near the front passenger door of the Honda Pilot. Meanwhile, Ross, still holding his phone in his left hand, walked in front of Renee's vehicle, a few feet from the front of the car.

34. Renee turned the wheels of the vehicle to the right — away from Ross, who was positioned at the front left of the vehicle. Renee began to slowly move forward, with the vehicle starting to make a right turn away from the agents. As she did so, Becca stepped back from the vehicle.

35. Ross then simultaneously moved away from the vehicle, his legs and body out of the vehicle's path, while drawing his firearm with his right hand and leaning forward to shoot into the vehicle. As Ross leaned forward to shoot, his left hand — still carrying his cell phone — contacted the car near the left headlight, as the car moved past him.

36. Ross, leaning forward, with his legs, head, and body out of the path of the vehicle, fired the first shot into the bottom left of Renee's windshield. As the car continued its slow right turn away from Ross, he fired two more times into the open driver's side window of the vehicle. Both these shots hit Renee's body. The second shot struck Renee on the left temple and was ultimately fatal.

37. Becca was a few feet from the rear passenger-side taillight of the Honda Pilot. She was within feet of the vehicle Ross fired three rounds into and within feet of the gunfire itself, on a residential street down which Ross's shots then sent the vehicle careening out of control. She saw and heard Ross shoot her partner.

38. At no time was Ross at risk of being run over by the vehicle. To the extent Ross's arm contacted the vehicle near the time of his first shot, it is because Ross intentionally leaned forward to position himself to shoot Renee.

39. By the time Ross fired the second and third shots, he was on the side of the vehicle, out of its path, firing through the open driver's side window as Renee was driving past him.

40. At no point did Renee pose anything resembling a danger to Ross or to any other person at the scene. It was evident that Renee was attempting to slowly drive away, and she had a calm, cordial exchange with Ross in the seconds before he fired. Ross had no reason to believe that he or any other officer was at risk of death or serious bodily injury.

41. No person, including Ross, was in the path of the vehicle at the moment he fired the first shot.

42. No person, including Ross, was in the path of the vehicle at the moment he fired the second shot.

43. No person, including Ross, was in the path of the vehicle at the moment he fired the third shot.

44. Even if Ross had unreasonably and erroneously believed that he was in danger when he fired, shooting Renee could not have mitigated any risk to him or to the other agents: firing at a driver in Renee's position only increases the danger to anyone in the vehicle's path, which is why mandatory DHS policy requires agents to consider the implications of an out-of-control conveyance before firing at a driver. Ross fired at Renee with no regard for the safety of anyone present at the scene.

45. After Ross shot Renee, her vehicle careened down the street, out of control, eventually stopping after it hit a parked car. As the car careened down the street, Ross uttered, "fucking bitch." Several bystanders were on the street, some of whom filmed portions of the incident.

46. Becca ran down the street to the vehicle, where she found Renee with a gunshot wound to her head.

47. Despite knowing that Renee had been shot, neither Ross nor the other ICE agents present rendered medical aid to Renee.

48. To the contrary, when a person on the street offered assistance, an ICE agent responded, "No, back up, now!" When the person identified himself as a physician, the ICE agent responded, "I don't care."

49. There was no reason it was impracticable to provide aid to Renee after she was shot and her vehicle crashed into a parked car. There was no active threat to any agent at any moment, and thus no barrier to the provision of medical care.

50. Renee arrived at Hennepin County Medical Center at 10:03 a.m. in cardiac arrest, approximately twenty-five minutes after initial civilian 911 calls. Despite extensive resuscitative efforts, she never regained a pulse. She was pronounced dead at 10:30 a.m.

51. An independent autopsy revealed that Renee had at least three gunshot wounds. One gunshot wound entered and exited Renee's left forearm, without hitting bone. Another wound entered and exited Renee's right breast. A third, fatal gunshot wound entered Renee's left temple and exited the right side of her head.

52. The Hennepin County Medical Examiner determined the manner of Renee's death to be homicide and the cause of her death to be multiple gunshot wounds, and recorded, as to how her injuries occurred, that the "[d]eceased was shot by a law enforcement officer."

53. From the moment the agents confined her until she lost consciousness, Renee suffered immense physical, mental, and emotional pain and suffering, and a total loss of the enjoyment of life.

## **The Agents' Conduct Violated the Fourth Amendment and Mandatory DHS Policies**

54. The Fourth Amendment to the United States Constitution guarantees the right of the people to be secure in their persons against unreasonable seizures. The application of deadly force is a seizure, and it is unreasonable unless the officer has

probable cause to believe that the person poses a threat of serious physical harm to the officer or to others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Deadly force may not be used against a fleeing person who poses no immediate threat. *Garner*, 471 U.S. at 11. DHS's own use-of-force policy acknowledges that "[t]he Fourth Amendment supplies a constitutional baseline for permissible use of force" by DHS law enforcement officers.

55. Ross seized Renee within the meaning of the Fourth Amendment when he fired three rounds into her occupied vehicle, striking her three times and killing her. That seizure was objectively unreasonable. At the moment Ross fired each of his three shots: Renee was unarmed, was suspected of no crime, and was not the subject of any law enforcement investigation; her stopped vehicle had not prevented traffic (including Ross's own vehicle) from proceeding; she had spoken to Ross moments earlier in calm and conciliatory terms; she had turned her wheels away from Ross and was driving slowly away from him and the other agents; Ross had moved his legs and body out of the vehicle's path, and was out of its path, before he fired and then leaned toward the vehicle to improve his shooting position; no person was in the path of the vehicle; and the second and third shots, including the fatal shot to Renee's left temple, were fired through the open driver's side window from the side of the vehicle as it moved away.

56. Ross's use of deadly force against the driver of a vehicle that was moving away from him and posed no immediate threat to anyone violated Renee's Fourth Amendment rights, as did the other agents' confinement of Renee — commanding her from

her car and grabbing at her door — without reasonable suspicion or probable cause of any offense.

57. Ross's conduct also violated the mandatory, Department-wide use-of-force policies binding every DHS law enforcement officer, as set forth in DHS Policy Statement 044-05 (Revision 01), *Update to the Department Policy on the Use of Force* (Feb. 6, 2023).[2]

58. DHS policy provides that officers "may use deadly force only when necessary, that is when the LEO has a reasonable belief that the subject of such force poses an imminent threat of death or serious bodily injury to the LEO or to another person."[3] It was plain to Ross that Renee posed no such threat to anyone. Ross was out of the vehicle's path before he fired his first shot, and he fired his second and third shots from the side of the vehicle as it moved away from him.

59. DHS policy commands that "[d]eadly force shall not be used solely to prevent the escape of a fleeing subject."[4] Renee was attempting to drive slowly away when Ross fired each of his three shots. Ross used deadly force solely to prevent her from leaving.

60. DHS policy prohibits officers "from discharging firearms at the operator of a moving vehicle, vessel, aircraft, or other conveyance unless the use of deadly force

---

[2] U.S. Dep't of Homeland Sec., Policy Statement 044-05 (Revision 01), *Update to the Department Policy on the Use of Force* (Feb. 6, 2023), available at https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf.
[3] *Id*. § VI.A.1.a.
[4] *Id*. § VI.A.1.b.

against the operator is justified under the standards articulated elsewhere in this policy," and requires that "[b]efore using deadly force under these circumstances, the LEO must take into consideration the hazards that may be posed to law enforcement and innocent bystanders by an out-of-control conveyance."[5] Ross fired three shots at the operator of a moving vehicle without justification and without regard for the consequences of an out-of-control vehicle, which is precisely what his shots produced, sending Renee's car careening driverless down a residential street until it struck a parked car.

61. DHS policy directs that officers "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of LEOs and the public" and "should also avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force."[6] Ross positioned himself at the front left of Renee's occupied vehicle while other agents confronted her; occupied one of his hands with the cell phone he was using to film; and leaned toward the vehicle to shoot when he was out of its path.

62. DHS policy permits officers to "use force only when no reasonably effective, safe, and feasible alternative appears to exist," and then only "the level of force that is objectively reasonable in light of the facts and circumstances confronting the LEO at the time force is applied."[7] Reasonably effective, safe, and feasible alternatives plainly existed:

---

[5] *Id*. § VI.B.2.a.
[6] *Id*. § III.C.1.
[7] *Id*. § II.B.

Ross needed only to remain out of the vehicle's path, where he already stood, and let Renee continue her right-hand turn.

63. DHS policy commands that, "[a]s soon as practicable following a use of force and the end of any perceived public safety threat, DHS LEOs shall obtain appropriate medical assistance for any subject who has visible or apparent injuries," including by "rendering first aid if properly trained and equipped to do so, requesting emergency medical services, and/or arranging transportation to an appropriate medical facility."[8] Ross and the other agents rendered no aid to Renee, and an agent affirmatively turned away a physician who offered to help.

64. DHS policy imposes on every officer "a duty to intervene to prevent or stop a perceived use of excessive force by another LEO," and requires every DHS employee with knowledge of an improper use of force to report it without unreasonable delay.[9] None of the agents present intervened to stop Ross or to prevent the escalation that preceded his shots, and none ensured that Renee received prompt medical attention after she was shot.

65. Each of Ross's three shots was fired in violation of these mandatory policies and of universally accepted law enforcement standards. None of the policies violated here confers discretion to do what Ross and the other agents did; each prescribes a specific, mandatory course of conduct that the agents disobeyed.

---

[8] *Id*. § III.G.
[9] *Id*. § III.H.

**The Losses Caused by Renee's Death**

66. Renee was thirty-seven years old at the time of her death. She was a loving and devoted mother to her three children. She had primary custody of her son E.M., age six, for whom she provided daily care and support, and for whom she would have continued to provide economic and emotional support, advice, services (including all of the responsibilities associated with raising a child), comfort, assistance, and protection for decades to come. She served on the school board at E.M.'s school and had recently applied to work there as a substitute teacher.

67. Renee had primary care of her two older children, S.S. (age fifteen) and R.S. (age twelve), during the summers and on alternating holidays, and she provided care and support to them year-round. During the summers, Renee would take her children to zoos, museums, and restaurants — she would spend time with her children exploring anything in which they were interested, and she always prioritized their enrichment and growth with whatever resources were available to her. She would have continued to provide economic and emotional support, advice, services, comfort, assistance, and protection to S.S. and R.S. for decades to come.

68. Renee had strong relationships with her parents and with each of her siblings. Before moving to Minneapolis, she lived near her parents and sister in the Kansas City area, and she remained close to her family after she moved: she spoke and texted with her parents and siblings regularly, traveled to see family members multiple times a year even when money was tight, and usually spent Christmas in Kansas City with her children, parents, siblings, and their families. She was a devoted aunt to her nieces and nephews.

Typifying her relationships with her siblings, Renee officiated Brent's wedding, and Brent officiated hers.

69. Renee was a voracious reader with an amazing singing voice who loved film and animals. She loved to write, especially poetry, and was preparing to pursue her master's degree in English. She had previously worked as a substitute teacher and as a bank teller, and was the primary provider and source of income for E.M., and for S.S. and R.S. during the periods when she was their primary caretaker.

70. Renee was shot three times and suffered immense physical, mental, and emotional pain and suffering in the final moments of her life, together with a total loss of the enjoyment of life. As a result of the conduct of Ross and the other ICE and DHS agents, Renee's children, parents, and siblings have been forever deprived of the economic support, services, advice, comfort, assistance, protection, and companionship of someone who was monumentally important to them and who cared for them deeply. They have suffered, and will continue to suffer, pecuniary loss of the highest order.

**The Injuries Inflicted on Becca Good**

71. Becca was standing feet from the Honda Pilot when Ross fired three rounds into it. She was within the zone of physical danger created by the agents' conduct, she reasonably feared for her own safety, and she watched her partner be shot in the head. She then ran to the wrecked vehicle and found Renee dying, while the agents who had shot her stood by and turned away a physician who offered to help.

72. Becca and Renee had built a life together. They moved to Minneapolis together, they lived together in south Minneapolis, and they were together raising Renee's

six-year-old son, E.M., for whom Renee had primary custody. Renee was the primary provider and source of income for their household. In the space of a few seconds, Becca lost her partner and became a witness to her killing.

73. Becca has suffered, and continues to suffer, severe emotional distress with attendant physical manifestations. She has been diagnosed with post-traumatic stress disorder and insomnia. She suffers extreme anxiety, has difficulty sleeping, and often wakes in a state of panic with her heart racing. She experiences traumatic flashbacks to the scene of the shooting. She has body aches and chest pains she did not previously experience, together with exhaustion, debilitating headaches, chills, temperature dysregulation, and digestive problems. She lost her appetite, often eating only one meal a day, and lost at least fifteen pounds in the weeks following the shooting. She sees a therapist weekly and a psychiatrist to treat the distress the agents' conduct caused.

## CAUSES OF ACTION

### COUNT I

### Wrongful Death — Minn. Stat. § 573.02
### (Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680)
### (Plaintiff Ganger)

74. Plaintiff Ganger realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

75. Under Minnesota law, "[w]hen death is caused by the wrongful act or omission of any person," the trustee appointed for the decedent's next of kin "may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission." Minn. Stat. § 573.02, subd. 1.

76. Renee's death was directly and proximately caused by the wrongful acts and omissions of Ross and the other ICE and DHS agents at the scene, each committed within the scope of their federal offices and employment, including: (a) the battery Ross committed when he shot Renee three times without justification, as pleaded in Count II; (b) the assault Ross committed when he pointed his firearm at Renee and fired without justification, as pleaded in Count III; (c) the false imprisonment of Renee by the agents at the scene, as pleaded in Count IV; (d) the intentional infliction of emotional distress upon Renee, as pleaded in Count V; and (e) the negligence of Ross and the other agents, including their negligent creation of the dangers that culminated in the shooting and their failure to render or permit medical aid, as pleaded in Count VI. Each of those predicate wrongful acts is realleged and incorporated here. Had she lived, Renee could have maintained an action for each of these wrongful acts and omissions.

77. As trustee, Plaintiff Ganger is entitled to recover all damages recoverable under Minn. Stat. § 573.02, including recovery "for all damages suffered by the decedent resulting from the injury prior to the decedent's death," Minn. Stat. § 573.02, subd. 1, and the pecuniary loss resulting from her death, which encompasses the full value of the contributions Renee would have made to her surviving next of kin, including lost income and economic support, the loss of the value of her services, and the loss of her advice, comfort, assistance, and protection. The recovery is for the exclusive benefit of the surviving next of kin, proportionate to the pecuniary loss severally suffered by the death. Minn. Stat. § 573.02, subd. 1.

78. Renee suffered immense conscious physical, mental, and emotional pain and suffering between the agents' unlawful confinement of her and her loss of consciousness, and her next of kin — her three minor children, her parents, and her four siblings — have suffered and will continue to suffer pecuniary loss, including the loss of her economic support, services, advice, comfort, assistance, protection, and companionship.

79. A private person who caused a death by such wrongful acts and omissions would be liable to Plaintiff Ganger under Minn. Stat. § 573.02 in like circumstances. Because Ross and the other agents were employees of the United States acting within the scope of their offices and employment, the United States is liable to Plaintiff Ganger for Renee's wrongful death under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT II**

**Battery**
**(Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680)**
**(Plaintiff Ganger)**

80. Plaintiff Ganger realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

81. Under Minnesota law, a battery is an intentional, unpermitted, offensive contact with another person.

82. Ross committed a battery against Renee when he intentionally shot her three times without her consent and without any legal justification. In doing so, Ross engaged in a series of acts that violated the Fourth Amendment, mandatory DHS policies, and universally accepted law enforcement standards, including: positioning himself at the front left of Renee's vehicle; filming the encounter with his cell phone, fully occupying one of

his hands; leaning toward Renee's vehicle to position himself to shoot as she attempted to slowly drive around him; firing his first shot into the bottom left of the windshield from a position out of the vehicle's path; and firing his second and third shots through the open driver's side window as Renee slowly drove past him.

83. Ross's use of force was not privileged. Renee posed no imminent threat of death or serious bodily injury to Ross or to anyone else; no person was in the vehicle's path when any shot was fired; and each shot was fired in violation of mandatory DHS policies prohibiting deadly force against fleeing subjects, prohibiting the discharge of firearms at the operator of a moving vehicle, and prohibiting officers from intentionally placing themselves in harm's way.

84. As a direct and proximate result of Ross's battery, Renee suffered three gunshot wounds, conscious physical, mental, and emotional pain and suffering, a total loss of the enjoyment of life, and death, and her next of kin have suffered the pecuniary losses described above. Because Ross was an investigative or law enforcement officer of the United States acting within the scope of his office and employment, the United States is liable for his battery under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674, 2680(h).

**COUNT III**

**Assault**
**(Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680)**
**(Plaintiff Ganger)**

85. Plaintiff Ganger realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

86. Under Minnesota law, an assault is an unlawful threat to do bodily harm to another with the present ability to carry the threat into effect.

87. Ross committed an assault against Renee when, without justification, he drew his firearm, pointed it at her, and fired into her vehicle, evincing an unlawful threat to do bodily harm to Renee with the present and demonstrated ability to carry that threat into effect. Renee, who posed no threat to anyone, was placed in reasonable apprehension of immediate bodily harm.

88. As a direct and proximate result of Ross's assault, Renee suffered fear, terror, and severe emotional distress in the final moments of her life, together with the injuries and death described above, and her next of kin have suffered the pecuniary losses described above. Because Ross was an investigative or law enforcement officer of the United States acting within the scope of his office and employment, the United States is liable for his assault under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674, 2680(h).

**COUNT IV**

**False Imprisonment**
**(Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680)**

**(Plaintiff Ganger)**

89. Plaintiff Ganger realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

90. Under Minnesota law, false imprisonment consists of (1) words or acts intended to confine a person, (2) actual confinement, and (3) the person's awareness of the confinement, where the confinement is without lawful justification.

91. The ICE and DHS agents at the scene falsely imprisoned Renee. Although Renee's stopped vehicle did not prevent traffic from proceeding — numerous vehicles, including Ross's, drove around it — the agents in the pickup truck refused her express invitation to "just go around." Instead, they emerged from their vehicle, shouted at her to get out of her car, and aggressively attempted to open her driver's side door, while Ross walked around and then in front of her vehicle. Through these aggressive actions and commands, the agents confined Renee in her vehicle, and Renee was aware of her confinement.

92. The agents had no lawful justification to confine Renee. ICE agents are not empowered to enforce Minnesota traffic laws, and the agents possessed no evidence or information that Renee had engaged in any unlawful obstructive conduct. Ross himself had easily driven around her vehicle. The agents appear to have confined Renee because she engaged in lawful activity protected by the First Amendment: honking her horn to alert her neighbors to ICE's presence. When Renee attempted to slowly drive out of the area in which she was unlawfully confined, Ross shot her three times.

93. As a direct and proximate result of the agents' false imprisonment of Renee, Renee suffered a deprivation of her liberty, fear, and severe emotional distress, together with the injuries and death described above, and her next of kin have suffered the pecuniary losses described above. Because the agents were investigative or law enforcement officers of the United States acting within the scope of their offices and employment, the United States is liable under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674, 2680(h).

## COUNT V

### Intentional Infliction of Emotional Distress
### (Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680)
### (Plaintiffs Ganger and Good)

94. Plaintiffs Ganger and Good reallege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

95. Under Minnesota law, a defendant is liable for intentional infliction of emotional distress where (1) the defendant's conduct was extreme and outrageous, (2) the conduct was intentional or reckless, (3) it caused emotional distress, and (4) the distress was severe.

96. Ross and the other ICE and DHS agents at the scene intentionally inflicted emotional distress upon Renee. Their unlawful confinement of a woman who had spoken to them calmly and cordially, their profane commands, their attempt to wrench open her car door, Ross's decision to shoot her three times as she attempted to drive slowly away, and the agents' refusal to render or permit medical aid as she lay dying constitute extreme and outrageous conduct that passes the boundaries of decency and is utterly intolerable in a civilized community.

97. The agents' conduct was intentional or reckless, and it caused Renee severe emotional distress — including terror, anguish, and the conscious apprehension of her own death — from the moment her unlawful confinement began until she lost consciousness.

98. As a direct and proximate result of the agents' extreme and outrageous conduct, Renee suffered severe emotional distress, together with the injuries and death described above, and her next of kin have suffered the pecuniary losses described above.

Because the agents were employees of the United States acting within the scope of their offices and employment, the United States is liable under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

99. The same extreme and outrageous conduct was directed at, and inflicted severe emotional distress upon, Plaintiff Good. Ross shot Renee three times, without any legal justification, in Becca's presence and within feet of where Becca stood, so that Becca was made to witness her partner's killing. The agents then refused to render aid to Renee and turned away a physician who offered to help, while Becca stood at the wrecked vehicle with her dying partner. That conduct passes the boundaries of decency and is utterly intolerable in a civilized community.

100. The agents' conduct was intentional or reckless as to Becca. Ross knew Becca was present: he had circled the Honda Pilot filming with his cell phone and had interacted with Becca moments before he fired. He then discharged his firearm three times into the vehicle occupied by Becca's partner and her dog, a few feet from where Becca stood, in violation of the Fourth Amendment, mandatory DHS use-of-force policies, and universally accepted law enforcement standards. That such conduct would inflict severe emotional distress on the partner standing feet away was its obvious and foreseeable consequence.

101. As a direct and proximate result of the agents' extreme and outrageous conduct, Becca has suffered severe emotional distress, including terror at the moment of the shooting, the trauma of witnessing her partner's killing, and the post-traumatic stress disorder, insomnia, anxiety, flashbacks, headaches, chest pains, body aches, exhaustion,

and appetite and weight loss described above, for which she requires ongoing psychiatric and therapeutic treatment. Because the agents were employees of the United States acting within the scope of their offices and employment, the United States is liable to Becca under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT VI**

**Negligence**
**(Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680)**
**(Plaintiff Ganger)**

102. Plaintiff Ganger realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

103. Ross and the other ICE and DHS agents at the scene owed Renee a duty to exercise reasonable care in the conduct of law enforcement operations, including in their use and handling of firearms, their positioning and tactics around an occupied vehicle, and their treatment of a person they had injured. The mandatory standards governing federal immigration enforcement, including 8 C.F.R. § 287.8 and the mandatory DHS use-of-force policies described above, reflect and inform the standard of care.

104. Although Ross and the other agents engaged in intentional unlawful conduct that directly and proximately caused Renee's death, they also engaged in negligent conduct that fell far beneath the duties and standard of care they owed to Renee. Ross engaged in conduct that unreasonably heightened the risk of danger to Renee, including: placing himself near the front of Renee's vehicle at a point when Renee was being confronted by multiple ICE agents; intentionally leaning toward the vehicle as it began to slowly move away from him; filming his encounter with Renee using a cellular phone, thereby

incapacitating his left hand during the encounter; and failing to consider the implications of an out-of-control conveyance prior to firing at the operator of a moving vehicle. Each of these acts created an unreasonable risk that Ross would erroneously feel compelled to use deadly force against Renee, and each run far afield of both universally accepted law enforcement practices and the mandatory DHS rules Ross was obliged to follow.

105. In addition, Ross and the agents who exited the pickup truck acted negligently by giving Renee contradictory instructions, commanding her from her vehicle while confronting her from multiple directions, thereby heightening the risks to Renee.

106. The agents further breached their duties to Renee after she was shot. By failing to render immediate medical aid and by affirmatively preventing bystanders, including one who identified himself as a physician, from rendering aid, the agents breached their obligation to provide prompt care to a person whom they had gravely injured, an obligation imposed by their common-law duties and by mandatory DHS policy. There was no active threat to any agent and no barrier to the provision of medical care.

107. None of the conduct described in this Count involved the permissible exercise of discretion. The duties the agents violated, including those enshrined in the Constitution, and the mandatory prohibitions and directives of DHS policy, prescribe specific courses of conduct, and no federal policy confers discretion to violate them.

108. As a direct and proximate result of the agents' negligence, Renee suffered three gunshot wounds, conscious physical, mental, and emotional pain and suffering, a total loss of the enjoyment of life, and death, and her next of kin have suffered the pecuniary losses described above. Because the agents were employees of the United States acting

within the scope of their offices and employment, the United States is liable under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT VII**

**Negligent Infliction of Emotional Distress**
**(Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680)**

**(Plaintiff Good)**

109. Plaintiff Good realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

110. Under Minnesota law, a plaintiff may recover for negligent infliction of emotional distress where she (1) was within the zone of danger of physical impact created by the defendant's negligence, (2) reasonably feared for her own safety, and (3) consequently suffered severe emotional distress with attendant physical manifestations. A plaintiff who satisfies those elements may recover damages for distress caused by fearing for another's safety or witnessing serious injury to another where she also stands in a close relationship to the third-party victim.

111. Ross and the other ICE and DHS agents at the scene owed Becca, as a person standing feet from the vehicle they confronted, a duty to exercise reasonable care in the conduct of law enforcement operations, including in their positioning and tactics around an occupied vehicle on a residential street and in their use and handling of firearms in the presence of civilians. The mandatory standards governing federal immigration enforcement, including 8 C.F.R. § 287.8 and the mandatory DHS use-of-force policies described above, reflect and inform the standard of care the agents owed to Becca as much as to Renee.

112. The agents breached that duty. Ross placed himself near the front of an occupied vehicle at a moment when other agents were confronting its driver from multiple directions; he occupied one of his hands with the cell phone he was using to film, incapacitating his left hand during the encounter; he intentionally leaned toward the vehicle as it moved slowly away from him; he fired three rounds into that occupied vehicle on a residential street where Becca and other civilians stood; and he did so without considering the hazards that an out-of-control conveyance would pose to bystanders, as mandatory DHS policy required him to do. The agents who exited the pickup truck compounded the danger by shouting profane and contradictory commands at Renee while confronting her from multiple directions. Each of these acts created an unreasonable risk of physical harm to the people standing nearby, including Becca.

113. Becca was within the zone of danger of physical impact created by that negligence. She was standing near the front passenger door of the Honda Pilot when the agents began shouting at Renee, and a few feet from its rear passenger-side taillight when Ross fired the first round through the bottom left of the windshield and two more rounds through the open driver's side window. She was within feet of the gunfire, and Ross's shots sent the Honda Pilot careening driverless down the residential street on which she stood until it struck a parked car.

114. Becca reasonably feared for her own safety. A federal agent discharged a firearm three times, without warning, a few feet from where she stood, into a vehicle she had been standing beside moments earlier.

115. As a direct and proximate result of the agents' negligence, Becca has suffered severe emotional distress with attendant physical manifestations, including post-traumatic stress disorder, insomnia, extreme anxiety and panic, traumatic flashbacks, debilitating headaches, chest pains, body aches, exhaustion, chills, temperature dysregulation, digestive problems, loss of appetite, and the loss of at least fifteen pounds in the weeks following the shooting, for which she requires ongoing psychiatric and therapeutic care.

116. Becca is further entitled to recover for the distress caused by fearing for Renee's safety and by witnessing the serious injury inflicted upon her, because she stood in a close relationship to Renee. Becca and Renee moved to Minneapolis together, lived together, and were together raising Renee's six-year-old son. Becca watched Ross shoot Renee in the head, ran to the wrecked vehicle, and found her partner dying there.

117. None of the conduct described in this Count involved the permissible exercise of discretion. The duties the agents violated, including the Constitution and the mandatory prohibitions and directives of DHS policy, prescribe specific courses of conduct, and no federal policy confers discretion to violate them.

118. A private person who inflicted such harm by such negligent acts and omissions would be liable to Becca under Minnesota law in like circumstances. Because the agents were employees of the United States acting within the scope of their offices and employment, the United States is liable to Becca under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Brent Ganger, as Trustee for the Next of Kin of Renee Nicole Macklin Good, and Rebecca Good respectfully request that this Court enter judgment against Defendant United States of America and award the following relief:

a. Compensatory damages to Plaintiff Brent Ganger, as Trustee, under the FTCA and Minn. Stat. § 573.02, including damages for the conscious pain and suffering and emotional distress Renee Nicole Macklin Good endured prior to her death and the pecuniary losses suffered and to be suffered by her next of kin;

b. Compensatory damages to Plaintiff Rebecca Good under the FTCA and Minnesota law for the severe emotional distress and attendant physical injuries she has suffered and will continue to suffer;

c. Plaintiffs' costs and disbursements as allowed by law;

d. Post-judgment interest as allowed by law; and

e. Such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Date: October 1, 2026<br><br>_/s/ Kevin Riach_ | Respectfully submitted,<br><br>_/s/ Antonio Romanucci_ |
| Kevin Riach<br>(MN Bar # 0389277)<br>The Law Office of Kevin C. Riach, PLLC<br>125 Main Street SE, Suite 339<br>Minneapolis, Minnesota 55414<br>kevin@riachdefense.com<br>(612) 203-8555 | Antonio Romanucci (*pro hac vice* forthcoming)<br>(Illinois ARDC # 6190290)<br>Daisy Ayllón (*pro hac vice* forthcoming)<br>(Illinois ARDC # 6317048)<br>Sarah Raisch (*pro hac vice* forthcoming)<br>(Illinois ARDC # 6305374)<br>Benjamin Berkman (*pro hac vice* forthcoming)<br>(Illinois ARDC # 6329445)<br>Stephen Weil (*pro hac vice* forthcoming) |

| | |
|---|---|
| | (Illinois ARDC # 6291026)<br><br>Romanucci & Blandin, LLC<br>321 N. Clark Street, Suite 900<br>Chicago, Illinois 60654<br>aromanucci@rblaw.net<br>(312) 458-1000<br><br>*Counsel for Plaintiffs* |